OPINION OF THE COURT
Lawrence H. Bernstein, J.
In the early morning hours of October 7,1983, Ruperto Rosado died as the result of three gunshot wounds he suffered while sitting in a chair in the living room of the apartment he shared with the defendant, Lydia Torres, his common-law wife. The defendant was arrested in connection with this fatal shooting and indicted for the crime of murder in the second degree.
The case presents the timely and novel question in New York whether to admit in evidence certain expert testimony proffered by the defendant concerning the “battered woman’s syndrome” to buttress defendant’s claim that she shot the deceased in self-defense.
In New York, except for People v Hamel (96 AD2d 644), a brief Third Department memorandum opinion, no reported decision has specifically addressed the question of the admissibility of testimony of this nature.* In Hamel, the court sustained the *130 refusal to admit psychiatric testimony that the defendant’s conduct was induced by past psychological trauma involving sexual assaults and threats, but the specific nature of this excluded expert testimony — that is, whether it concerned the battered woman’s syndrome — was never discussed. The court therein merely held that in the normal case in which a justification claim is raised it is best to exclude psychiatric evidence as to the defendant’s state of mind.
Recently, in other jurisdictions, the battered woman’s syndrome has been the subject of considerably more controversy, centering primarily upon whether the concept of a battered woman, is a matter of commonly accepted scientific knowledge to warrant expert opinions with respect thereto. (See, Frye v United States, 293 F 1013; also compare, Ibn-Tamas v United States, 407 A2d 626 [DC App], with Buhrle v State, 627 P2d 1374 [Wyo].)
The courts that have considered the question whether to allow expert opinion about battered women have divided in their result, with the trend more in favor of its admissibility (compare the following cases which support admission: State v Anaya, 438 A2d 892 [Me]; Hawthorne v State, 408 So 2d 801 [Fla]; Smith v State, 247 Ga 612, 277 SE2d 678; State v Kelly, 97 NJ 178, 478 A2d 364; Ibn-Tamas v United States, 407 A2d 626, supra; State v Allery, 101 Wn 2d 591, 682 P2d 312, with the following which disallow the expert evidence: Buhrle v State, 627 P2d 1374 [Wyo], supra; State v Thomas 66 Ohio St 2d 518, 423 NE2d 137).
In order to place defendant’s offer of proof in its proper perspective, it is necessary to first summarize some of the law relating to the justification defense and then to briefly recite certain of the essential facts of the case from the defendant’s standpoint:
Under the law of justification, a person may use deadly physical force against another when he reasonably believes that his defensive use of such deadly physical force is necessary to prevent serious physical injury or death to himself (Penal Law § 35.15 [2]).
The standard for the evaluation of the reasonableness of the defendant’s belief and conduct is not what the ordinary prudent man would have believed or done under the same circumstances. The test is, rather, whether the defendant’s subjective belief as to the imminence and seriousness of the danger was reasonable (People v Desmond, 93 AD2d 822). It is the defendant’s state of *131 mind and sense of fear which is critical to a justification defense (see, People v Miller, 39 NY2d 543).
In this regard, proof of violent acts previously committed by the victim against the defendant as well as any evidence that the defendant was aware of specific prior violent acts by the victim upon third parties is admissible as bearing upon the reasonableness of defendant’s apprehension of danger at the time of the encounter. (People v Miller, 39 NY2d 543, supra.)
In this case, the defendant did not merely offer proof of a few isolated instances of the deceased’s past violent conduct to buttress the claim of self-defense. Instead, it was the theory of the defense that Lydia Torres was a battered woman; that is, a victim of prolonged physical and psychological maltreatment who, as a result of her intimate and long-term familiarity with the deceased’s history of violence, was convinced at the time of the shooting that she was in serious danger.
To establish the reasonableness of this conviction, evidence was adduced from the defendant concerning her 10-year common-law relationship with the deceased. She recounted that her life with Rosado had been marred by recurring violent incidents separated by periods of relative calm and harmony, and that the deceased’s frequent beatings of her and threats of harm were usually associated with his heavy drinking and accompanied by accusations of infidelity and disloyalty. At times, Rosado’s violence escalated to more dangerous proportions as when, in the course of several domestic disputes, he menaced her with a knife and the pistol he was licensed to carry as the owner of a liquor store, and when, with the defendant as a bystander, he stabbed a young man in a street fight and shot another in an attempted robbery of the liquor store.
According to defendant’s detailed testimony of the events that culminated in Rosado’s death at around 11:30 p.m. on October 6, 1983, she and Rosado closed the liquor store and returned to their apartment on 137th Street in the company of Roberto, the deceased’s son by a prior marriage, and Mochito, the defendant’s brother. Soon after these relatives departed, a violent quarrel erupted in the bedroom. Rosado, who had been drinking, flew into a jealous rage, accusing the defendant of having sexual relations with his son Roberto. When she denied this, he grabbed her by the hair and repeatedly struck her in the face and back. Screaming that “this is going to be your last night”, he placed his pistol firmly against her mouth. He then threw her on the bed, placed the gun on the night table, and walked into the living room where he sat down in a chair. From there, he *132 continued to threaten the defendant, yelling: “I told you the day you would be unfaithful to me, I’ll kill you”. Convinced that the savageness of this behavior was different in degree from anything she had previously experienced and that this time the deceased really meant to kill her, the defendant grabbed the gun from the table, went into the living room and shot him three times while he sat in the chair.
To complete this portrait of defendant as a reactive victim of domestic violence, the defense proffered the expert opinion of Dr. Julie Blackman that Lydia Torres suffered from the battered woman’s syndrome. Dr. Blackman is an assistant professor of psychology at Barnard College of Columbia University with a specialization in the psychology of women. She has conducted research into violence in the family and is awaiting publication of a book based thereon entitled Intimate Violence: A Study of Injustice. She has also published numerous papers in journals on the subject of battered women and on the nature of physical and sexual assaults in family systems.
A Frye hearing (see, Frye v United States, 293 F 1013, supra) at which Dr. Blackman was the only witness was conducted outside of the presence of the jury to determine the relevance of her expert opinion as well as its admissibility under the standards for the acceptance of scientific evidence.
DESCRIPTION OF BATTERED WOMAN’S SYNDROME
According to Dr. Blackman’s hearing testimony, a recognition by social scientists of the high incidence of wife beating has produced in the past decade intensive research into the forces that generate and perpetuate domestic violence against women. As a result of this effort, these social scientists have formulated what is termed the battered woman’s syndrome, a description of identifiable psychological characteristics exhibited by women who have experienced physical and emotional abuse in an intimate relationship over an extended period of time.
Among the characteristics of such abused women are a decrease in self-esteem, an emotional dependence upon the dominant male and a type of psychological “learned” helplessness arising out of an inability to predict or control the violence directed against them. Numbed by a dread of imminent aggression, these women are unable to think clearly about the means, of escape from this abusive family existence; and this emotional paralysis is often reinforced by their traditional beliefs about the sanctity of home and family and their false hopes that things will improve — the latter delusion generated by the brief periods of relative calm that follow the abuser’s short-lived promises *133 to reform (for some basic studies of the problem of battered women, see, e.g., Walker, The Battered Woman [1979]; Martin, Battered Wives [1976]; Battered Women: A Psychosociological Study of Domestic Violence [M Roy ed 1977]).
RELEVANCE OF PROPOSED EXPERT EVIDENCE
Based upon two pretrial interviews she conducted with the defendant, it was Dr. Blackman’s professional opinion that Lydia Torres exhibited many of the traits associated with prolonged domestic abuse and suffered from the battered woman’s syndrome.
In this regard, it is noted that the proposed testimony that the defendant was a battered woman was neither intended to establish that this syndrome was a mental disease or defect relieving defendant of criminal responsibility for any criminal conduct (Penal Law § 30.05) nor that the syndrome itself constituted “an extreme emotional disturbance” by which an intentional killing is reduced in degree from murder to manslaughter. In fact, Dr. Blackman stated that the battered woman’s syndrome is not even currently classified as a separate psychiatric diagnostic category. The syndrome is best understood as being descriptive of an identifiable group of symptoms that characterize the behavior and state of mind of abused women rather than being disease-like in character.
The defendant offered the expert opinion as being central to her justification defense. In particular, it was proposed that Dr. Blackman would testify that a battered woman, through her extensive experience with prolonged physical abuse, learns to distinguish between varying degrees of danger and violence. This expert explanation concerning such acute discriminatory powers would provide a basis for the jury to understand how at the time of the shooting Rosado’s violence had, in the defendant’s mind, passed from the “normal” and tolerable into the “abnormal” and life threatening.
More significantly, the proffered expert evidence would also serve to dispel the ordinary lay perception that a woman who remains in a battering relationship is free to leave her abuser at any time. In fact, according to Dr. Blackman, the feeling of no escape is one of the principal common characteristics of battered women. It arises out of a combination of factors including a lack of anyplace else to go, a state of “learned helplessness”, a fear that if found she will be subjected to even more merciless treatment, an attachment to the traditional values of the stability of the family, and a hope that her mate will change for the better.
*134 In sum, Dr. Blackman’s opinions would counter the jury’s “commonsense” conclusions that the beatings and threats the defendant testified to could not have been at all that bad or else she would have left long before. The expert evidence would, therefore, help the jury understand that the defendant could reasonably fear serious harm from her mate and yet remain with him.
From this brief summary, it is apparent that the proffered expert evidence is admissible as having a substantial bearing on the defendant’s state of mind at the time of the shooting and is, therefore, relevant to the jury’s evaluation of the reasonableness of her perceptions and behavior at that time.
BATTERED WOMAN’S SYNDROME AS SCIENTIFIC EXPERT EVIDENCE
Having determined its relevance to the claim of self-defense, it remains to be resolved whether such testimony concerning the battered woman’s syndrome meets the standard for the admissibility of expert scientific evidence.
In New York a twofold test has been adopted for determining admissibility: (1) does the opinion testimony “depend upon professional or scientific knowledge or skill not within the range of ordinary training or intelligence” (Dougherty v Milliken, 163 NY 525, 533; People v Allweiss, 48 NY2d 40) and (2) is the state of the pertinent art or scientific knowledge sufficiently developed to permit a reasonable opinion to be asserted even by an expert (see, People v Leone, 25 NY2d 511; Frye v United States, 293 F 1013, supra; McCormick, Evidence § 13 [Cleary 2d ed 1972]).
The law is settled that the admissibility and bounds of expert testimony rest primarily within the sound discretion of the trial court (People v Henson, 33 NY2d 63).
With respect to the first criterion, as previously discussed, the average layman has numerous misconceptions concerning the options available to a victim of domestic abuse. Thus, Dr. Black-man’s specialized knowledge would properly assist the jury in understanding the unique pressures which are part and parcel of the life of a battered woman, and, in this manner, enable the jury to disregard their prior conclusions as being common myths rather than informed knowledge.
It is further noted that this determination that the subject matter of the battered woman is one outside of the common knowledge of the trier of fact is in line with a recent trend of decisions receiving in evidence expert testimony concerning similarly complex psychological and social phenomena (see, e.g., *135 People v Fisher, 73 AD2d 886, affd 53 NY2d 907 [phenomenon, of “repression”]; People v Reid, 123 Misc 2d 1084 [“rape trauma syndrome”]; People v Benjamin R., 103 AD2d 663 [untimely disclosure of child sexual abuse]).
Furthermore, there is no reason to adopt a blanket rule of preclusion for expert testimony relating to a defendant’s state of mind in a case where justification is claimed, as suggested in People v Hamel (96 AD2d 644, supra), for fear that the expert will usurp the jury’s function in determining the ultimate issue of reasonableness.
Instructive in this regard is the recent case of People v Cronin (60 NY2d 430) concerning the issue of intoxication. In that case, the trial court disallowed expert opinion on the effect of drugs and alcohol consumption on the defendant’s ability to formulate an intent because this was the ultimate question to be decided by the jury. The Court of Appeals reversed, holding that opinion testimony going to the defendant’s mental state does not invade the province of the jury and is admissible as long as it involves a subject matter beyond the ken of the jury (People v Cronin, 60 NY2d 430, 433, supra).
The second criterion for determining admissibility — whether the scientific theory possesses that degree of reliability to have gained general acceptance in the particular field to which it belongs — is more troublesome to meet. In fact, those jurisdictions which have disallowed expert evidence concerning the battered woman’s syndrome have done so largely on the basis of what they regard as the novelty of its scientific theory and the tentativeness of its conclusions (see, Buhrle v State, 627 P2d 1374 [Wyo], supra; Ibn-Tamas v United States, 455 A2d 893, 894 [concurring opn]).
Upon careful reflection and analysis, however, it is the opinion of this court that the theory underlying the battered woman’s syndrome has indeed passed beyond the experimental stage and gained a substantial enough scientific acceptance to warrant admissibility. According to Dr. Blackman, numerous articles and books have been published about the battered woman’s syndrome; and recent findings of researchers in the field have confirmed its presence and thereby indicated that the scientific community accepts its underlying premises.
Accordingly, for all the reasons hereinbefore enumerated, the court, in its discretion, will permit the use of expert testimony about the battered woman’s syndrome to help substantiate defendant’s claim of self-defense.

 People v Powell (102 Misc 2d 775 [County Ct, Tompkins County]) held that the “battered woman’s syndrome”, which it characterized as a novel theory of defense, did not constitute newly discovered evidence (CPL 440.10 [1] [g]) sufficient to set aside defendant’s second degree murder conviction. The *130 case did not decide whether such evidence would have been admissible at trial in the first instance.