No. 57,817

STATE OF KANSAS, *Appellee*, v. JOAN E. HODGES, *Appellant.*
(716 P.2d 563)

Opinion filed March 28, 1986.

*Carl E. Cornwell*, of Kansas City, argued the cause and was on the brief for the appellant.

*Nick A. Tomasic,* district attorney, argued the cause, and *Robert T. Stephan,* attorney general, and *Ted Baird* and *Catherine M. Foster,* assistant district attorneys, were with him on the briefs for the appellee.

The opinion of the court was delivered by

SCHROEDER, C.J.: This is a criminal action in which Joan Hodges (defendant-appellant) appeals from her conviction by a Wyandotte County jury of voluntary manslaughter (K.S.A. 21-3403) in the shooting of her husband, Harvey Hodges. The defendant claims the trial court erred in refusing to permit expert testimony on the battered woman syndrome and erred in its instructions to the jury on self-defense by using the word "immediate" rather than "imminent."

At approximately 3:00 a.m. on July 19, 1983, the defendant shot and killed her husband with a 12-gauge shotgun. The defendant claims she shot him in self-defense. Around 2:00 a.m. that same morning, defendant's stomach was upset and she went to a convenience store to get some Di-Gel for herself and some Skoal for her husband. She returned, went into the bedroom where her husband was lying in bed watching TV, and handed him the Skoal. Before she was out of the bedroom doorway, he jumped off the bed, grabbed her by the back of the hair and slammed her head against the doorjamb of the bedroom door twenty times saying, "God damn you. It's all right if you've got Di-Gel [but] you don't care if my blood sugar is 264. I'm going to kill you." Defendant soiled her clothes and told Harvey she needed to go to the bathroom. Harvey shoved her; she sprawled onto the floor and he repeatedly kicked her toward the bathroom with his bare feet. While the defendant cleaned herself up in the bathroom, Harvey continued to yell and threaten her from the bedroom. After changing into a nightgown, the defendant left the bathroom, went into a smaller bedroom and threw her clothes down on the bed. When she heard Harvey say, "God damn you. Get in here now," she reached for the shotgun in the closet, ran into the open bedroom doorway, and fired twice. Without knowing whether she had hit Harvey, defendant ran out of the house and to her mother's, Mrs. Bushey, who lived next door. The defendant and her mother called the police from a neighbor's house because Mrs. Bushey had no telephone.

Harvey died from massive blood loss due to two wounds located near each armpit. At the time of the shooting, he was

lying horizontally on the bed. Harvey was a strong, well-muscled man measuring 5'8" and weighing 245 pounds. His liver was examined during the autopsy. The pathologist testified Harvey had been a drinker for a considerable length of time, and in significant amounts. Harvey also suffered from diabetes.

The defendant, her mother, daughter, and grandson testified to an incident which occurred on July 16, 1983, three days before the shooting. The defendant's daughter and grandson came to visit the defendant that day and toward supper time they went to the grocery store to get food. They returned home and, as defendant was halfway across the street in front of her house, Harvey came speeding around the corner in his truck, trying to run the defendant down, even swerving up on the sidewalk. The defendant's daughter pushed her out of the way and they then entered Mrs. Bushey's house. As they left the house, Harvey pulled up on the back driveway, screeched to a halt, and jumped out of the truck yelling at defendant that she was not to leave the house without his permission. Harvey began hitting the defendant and when defendant's daughter tried to intervene, he knocked her onto the hood of the car. After getting defendant's grandson inside, Mrs. Bushey yelled at Harvey to stop. He then ran onto the porch and struck her. Harvey took defendant home, pushed her into the kitchen and tried to drown her in the kitchen sink by running water up her nose. He eventually let her go and told her to fix him dinner.

The defendant, her mother, and daughter also testified that defendant and Mrs. Bushey had taken a trip to Las Vegas from July 9 to July 15, 1983, the week preceding the shooting. The defendant and her mother testified Harvey knew about their trip to Las Vegas and that he had given defendant the money for the ticket. Other witnesses, however, testified Harvey thought the defendant had gone to the Lake of the Ozarks to see her aunt and that he spent the evening of July 16, 1983, with Robert Denny. There is also a dispute whether defendant and her mother returned from Las Vegas on Friday, July 15 or Saturday, July 16.

Although defendant and other members of her family related various incidents of abuse Harvey inflicted upon defendant, other witnesses testified Harvey was an easy-going man, quiet and never angry or violent towards anybody.

Defendant first contends the trial court erred in refusing to

allow expert testimony on the battered woman syndrome. A hearing was held February 10, 1984, before defendant's first trial on defendant's motion to allow expert testimony. After hearing the proffered testimony, the trial court ruled the testimony was not relevant to defendant's claim of self-defense, and its prejudicial effect would outweigh any probative value. After the first trial ended in a hung jury, the parties stipulated that although the defendant again requested to advance expert testimony on the battered woman syndrome, both the proposed proffer which would be presented and the trial court's ruling would remain the same.

Dr. Ann Bristow, an assistant professor of psychology at Kansas State University, testified at the hearing on the motion as defendant's expert. Her proffered testimony was that she received a Ph.D. in clinical psychology from Virginia Commonwealth University in Richmond, Virginia, and has been a full-time teacher and researcher at KSU since 1980. Dr. Bristow is a volunteer clinical consultant to the Manhattan, Kansas, domestic violence shelter where she works with battered women and their children. In January 1984, she served on the U.S. Attorney General's task force on domestic violence.

Dr. Bristow explained the battered woman syndrome is a post-traumatic stress disorder with the particular stressor being wife abuse. Symptoms manifested by a woman suffering from the syndrome include an attempt to minimize the violence and to live for the positive aspects of the relationship. She lives in a highly fearful state, becoming very sensitive to when the situation is becoming more violent and to those things that precede arguments. The batterer isolates the woman and will not allow her to go places, and she becomes more and more withdrawn. Few women will discuss their problems even with close family members because of their feeling that there is nothing that can be done about the situation. They have a "learned helplessness"; the more the repeated trauma occurs, the more the woman learns she has no control.

Dr. Bristow testified it is hard for the average lay person to understand why a battered woman doesn't get out of the situation, or call the police. There are misconceptions that these women deserve such treatment. Dr. Bristow spent a total of seven and one-half hours with the defendant and expressed the

opinion defendant's behavior fell within the battered woman syndrome.

The admission of expert testimony is governed in Kansas by K.S.A. 60-456(b), which states:

"If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness."

The basis for the admission of expert testimony is necessity, arising out of the particular circumstances of the case. Where the normal experience and qualifications of lay persons serving as jurors permit them to draw proper conclusions from given facts and circumstances, expert conclusions or opinions are inadmissible. *Lollis v. Superior Sales Co.*, 224 Kan. 251, 580 P.2d 423 (1978). First, to be admissible, expert testimony must be helpful to the jury. *State v. Reed*, 226 Kan. 519, 601 P.2d 1125 (1979). Second, before expert scientific opinion may be received into evidence at trial, the basis of that opinion must be shown to be generally acceptable within the expert's particular scientific field. *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923); *State v. Washington*, 229 Kan. 47, 662 P.2d 986 (1981). That same test is applicable to the admission of testimony regarding a psychiatric diagnosis. *State v. Marks*, 231 Kan. 645, 647 P.2d 1292 (1982).

The State argues the above testimony is not helpful to the jury because the jury heard ample evidence concerning the alleged abuse, and defendant had explained why she stayed with Harvey. The defendant did testify at trial concerning her marriage to the victim. They were first married in 1950 when defendant was seventeen, and early on Harvey beat her and tried to strangle her. Although defendant left him many times, he would find her and she would return home with him. The defendant related one incident where, after Harvey found her, he took her to a wooded location where he beat her, broke her jaw, and said she was either going to live with him or she wasn't going to live. He left her there unconscious, but eventually returned, took her to the hospital, and told her to tell the hospital staff she fell down. She returned home with him because he had her children. The defendant didn't call the police after any beatings because Harvey had threatened her life if she did. They were divorced in 1957 and remarried in 1970. Harvey had explained he was

hot-headed before and wanted to make up for the previous things he had done. The defendant left him again in 1974, but he found her and eventually she stopped trying to run from him. The beatings did not stop. On June 4, 1978, Harvey threw a Coke bottle at her, hitting her in the back near the left shoulder blade. Her mother took her to the emergency room and just as the defendant was ready to make a police report, Harvey walked in and said, "You tell the police that and you will never tell anybody anything again." A medical report dated August 15, 1979, reflected the defendant slipped and fell, but defendant testified Harvey beat her unconscious. Another medical report dated December 21, 1980, reflected the defendant was beaten by her husband. Harvey had beaten her and kicked her down the porch stairs. Finally, a medical report dated February 6, 1983, showed the defendant slipped on ice and lacerated her left knee on concrete. The defendant testified she was coming home from her mother's and Harvey pushed her down onto the icy concrete, causing a cut in her knee which required 63 stitches. The defendant's family members—her mother and daughter—testified that Harvey had threatened them if they ever called the police or helped the defendant to leave him.

We disagree with the State's contention the jury does not need help in addressing the foregoing evidence.

The Supreme Court recently recognized the dilemma of jurors understanding a battered woman's situation in *State v. Hundley*, 236 Kan. 461, 467, 693 P.2d 475 (1985).

"[T]here is no easy answer to why battered women stay with their abusive husbands. Quite likely emotional and financial dependency and fear are the primary reasons for remaining in the household. They feel incapable of reaching out for help and justifiably fear reprisals from their angry husbands if they leave or call the police. The abuse is so severe, for so long a time, and the threat of great bodily harm so constant, it creates a standard mental attitude in its victims. Battered women are terror-stricken people whose mental state is distorted and bears a marked resemblance to that of a hostage or a prisoner of war. The horrible beatings they are subjected to brainwash them into believing there is nothing they can do. They live in constant fear of another eruption of violence. They become disturbed persons from the torture."

Expert testimony on the battered woman syndrome would help dispel the ordinary lay person's perception that a woman in a battering relationship is free to leave at any time. The expert evidence would counter any "common sense" conclusions by the jury that if the beatings were really that bad the woman

would have left her husband much earlier. Popular misconceptions about battered women would be put to rest, including the beliefs the women are masochistic and enjoy the beatings and that they intentionally provoke their husbands into fits of rage. See Walker, The Battered Woman, 19-31 (1979).

Of the jurisdictions which have considered this question, the majority have ruled a battering relationship is a subject beyond the understanding of the average juror. We agree. See *People v. Torres*, 128 Misc. 2d 129, 488 N.Y.S. 2d 358 (1985); *State v. Kelly*, 97 N.J. 178, 478 A.2d 364 (1984); *Ibn-Tamas v. United States*, 407 A.2d 626 (D.C. 1979); *Smith v. State*, 247 Ga. 612, 277 S.E.2d 678 (1981); *Hawthorne v. State*, 408 So. 2d 801 (Fla. Dist. App.), *rev. denied* 415 So. 2d 1361 (Fla. 1982); *State v. Anaya*, 438 A.2d 892 (Me. 1981). Contra *State v. Thomas*, 66 Ohio St. 2d 518, 423 N.E. 2d 137 (1981); *State v. Griffiths*, 101 Idaho 163, 610 P.2d 522 (1980).

The second requirement to be met here before expert scientific opinion may be admitted into evidence is that the basis of that opinion must be shown to be generally acceptable within the expert's particular scientific field. *State v. Washington*, 229 Kan. 47; *State v. Marks*, 231 Kan. 645.

*Ibn-Tamas v. United States*, 407 A.2d 626, is one of the earlier cases to consider the admissibility of expert testimony on the battered woman syndrome. The court emphasized the focus is on the general acceptance of a particular *methodology* in the field and not on the subject matter studied, stating:

"Thus, the relevant question here is whether Dr. Walker's methodology for identifying and studying battered women has such general acceptance—not whether there is, in addition, a general acceptance of the battered woman concept derived from that methodology." 407 A. 2d at 638.

The court in *Ibn-Tamas* remanded the case because the trial court had failed to rule on the expert's qualifications and whether the expert's methodology received a general acceptance. On remand, the lower court concluded the defendant failed to establish a general acceptance by the expert's colleagues of the methodology used in the expert's study of battered women. The case was again appealed and the appellate court held that the trial judge was not compelled, as a matter of law, to admit the testimony. *Ibn-Tamas v. United States*, 455 A.2d 893 (D.C. 1983).

The Florida court's experience is similar. In *Hawthorne*, 408 So. 2d 801, the court concluded that expert testimony on the battered woman syndrome would aid the jurors and the case was remanded for the trial court to determine whether the expert was qualified and the extent to which her methodology was generally accepted. On remand, the trial court refused to allow the expert testimony, finding the expert was not qualified. On appeal, the court ruled there was no abuse of discretion by the lower court. *Hawthorne v. State*, 470 So. 2d 770 (Fla. Dist. App. 1985).

In *Buhrle v. State*, 627 P.2d 1374, 1378 (Wyo. 1981), the court rejected the expert's testimony on the syndrome stating, "[W]e are not saying this type of expert testimony is not admissible; we are merely holding that the state of the art was not adequately demonstrated to the court, and because of inadequate foundation the proposed opinions would not aid the jury."

The Ohio court in *State v. Thomas*, 66 Ohio St. 2d 518, rejected expert testimony on the battered woman syndrome, ruling the subject matter of the expert testimony was within the understanding of the jury and was not sufficiently developed, as a matter of commonly accepted scientific knowledge, to warrant expert testimony.

The court in *State v. Kelly*, 97 N.J. at 210-11, recognized three ways a proponent of scientific evidence can prove its general acceptance and thereby its reliability: (1) through the expert's testimony; (2) by authoritative scientific and legal writings; and (3) by judicial opinions indicating the expert's premises have been generally accepted. The court ruled the battered woman syndrome had a sufficient scientific basis to produce uniform and reasonably reliable results. The case was remanded, however, because the State had not been given a full opportunity to question the expert's methodology.

The New York Supreme Court has ruled the theory underlying the battered woman syndrome is beyond the experimental stage and has gained a substantial enough scientific acceptance to warrant admissibility. *People v. Torres*, 128 Misc. 2d at 135.

Dr. Bristow explained at the hearing on the motion that this field has been researched for ten years with extensive publications and articles, and four or five books written on the subject matter of the battered woman syndrome. When questioned whether there is a common acceptance within the scientific

community, Dr. Bristow enumerated two ways to tell. One indication is the extent to which the battered woman syndrome is referred to in professional literature. She testified it is noted in the American Medical Association Journal, in social workers' journals, and in experimental and clinical psychologists' journals, and that papers from conferences on domestic violence cover the topic. Second, by looking at which professionals are involved in either intervention or research of battered women, one can determine the extent of its acceptance. Dr. Bristow testified psychiatrists and psychologists are doing research in this area.

As we stated in *State v. Washington*, 229 Kan. 47, it is the *basis* of the expert's opinion that must be shown to be generally accepted. The record before us reveals the theory underlying the battered woman syndrome has gained a substantial enough scientific acceptance to warrant admissibility. It also appears from the record Dr. Bristow is a qualified expert on the subject of the battered woman syndrome. Furthermore, she spent a total of seven and one-half hours with the defendant and found the defendant suffered from the syndrome. The State had an ample opportunity to question Dr. Bristow about the methodology used. We hold it was error for the trial court to exclude the expert testimony on the battered woman syndrome.

The State argues the testimony is not relevant to defendant's claim of self-defense, which in Kansas is determined by an objective standard of reasonableness, rather than a subjective standard.

Whether a subjective standard or an objective standard is applied, evidence of the battered woman syndrome is relevant to a claim of self-defense. In a state that follows the subjective standard, an evaluation of defendant's actions is made in light of her subjective impressions and the facts and circumstances known to her. See *People v. Torres*, 128 Misc. 2d 129; *State v. Kelly*, 102 Wash. 2d 188, 685 P.2d 564 (1984). In states following the objective standard, the jury must determine whether the defendant's belief in the need to defend one's self was reasonable and the expert's testimony, if accepted by the jury, would aid it in determining whether, under the circumstances, a reasonable person in the defendant's position would have believed her life to be in imminent danger. *State v. Kelly*, 97 N.J. at 202.

In *State v. Hundley*, 236 Kan. at 467, we stated:

"The objective test is how a reasonably prudent battered wife would perceive [the aggressor's] demeanor. Expert testimony is admissible to prove the nature and effect of wife-beating just as it is admissible to prove the standard mental state of hostages, prisoners of war, and others under long-term life-threatening conditions."

Actually, to ask how a reasonably prudent battered woman would have perceived the aggressor's demeanor results in applying a subjective standard of reasonableness, *i.e.*, from the viewpoint of defendant's mental state. The same facts perceived by a person who has been repeatedly abused in a relationship would certainly be perceived differently by an ordinary and prudent non-battered person.

Therefore, we hold where the battered woman syndrome is in issue, the proper standard to determine whether the accused's belief in asserting self-defense was reasonable is a subjective standard. The jury must determine, from the viewpoint of the defendant's mental state, whether the defendant's belief in the need to defend herself was reasonable.

The State argues the defendant put her mental state in issue and, as such, failed to comply with the notice requirement of the insanity plea under K.S.A. 22-3219. Self-defense and insanity are completely different concepts. In an insanity defense, the issue to be determined by the jury is whether the accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing or, if he did know, that he did not know right from wrong with respect to the act. *State v. Boan*, 235 Kan. 800, 809, 686 P.2d 160 (1984). By comparison, the issue to be determined by a jury in a self-defense claim is whether the defendant reasonably believed himself to be in imminent danger. K.S.A. 21-3211; *State v. Simon*, 231 Kan. 572, 646 P.2d 1119 (1982). Here the expert's testimony was not offered to show the defendant suffered from any mental defect, thereby relieving her of criminal responsibility. Rather, the testimony was offered to explain the reasonableness of defendant's belief that she was in imminent danger from her husband. See *People v. Torres*, 128 Misc. 2d 129; *State v. Kelly*, 102 Wash. 2d 188; *Hawthorne v. State*, 408 So. 2d 801; *Terry v. State*, 467 So. 2d 761 (Fla. Dist. App.), *rev. denied* 476 So. 2d 675 (Fla. 1985).

Under the proffer, the expert is not passing on the defendant's

credibility as the State contends. The effect of the expert testimony would be to explain why a defendant suffering from the battered woman syndrome wouldn't leave her husband. The expert would not be testifying as to defendant's credibility, which is clearly within the province of the jury. The expert would be explaining to the jury the nature of the battered woman syndrome and giving an opinion whether the defendant suffers from the syndrome.

Evidence of the battered woman syndrome is not a defense to a murder charge. The evidence is introduced to help the jury understand why a battered woman is psychologically unable to leave the battering relationship and why she lives in a high anxiety of fear from the batterer. The evidence aids the jury in determining whether her fear and her claim of self-defense are reasonable. It was error for the trial court to exclude the expert testimony on the battered woman syndrome.

The defendant argues the trial court erred in giving the self-defense instruction using the word "immediate" rather than "imminent."

The jury instructions given on self-defense followed PIK Crim. 2d 54.17, as follows:

"The defendant has claimed her conduct was justified as self-defense.

"A person is justified in the use of force against an aggressor when and to the extent it appears to her and she reasonably believes that such conduct is necessary to defend herself against such aggressor's immediate use of unlawful force. Such justification requires both a belief on the part of defendant and the existence of facts that would persuade a reasonable person to that belief."

We held in *Hundley* the PIK Crim. self-defense instruction using the word "immediate" rather than the statutory word "imminent" was reversible error.

The issues presented and the procedural posture of this case are very similar to those in *State v. Osbey*, 238 Kan. 280, 710 P.2d 676 (1985). We ruled in *Osbey* that because the *Osbey* case was similar and was pending at the time of the *Hundley* decision, the *Hundley* decision, a later overruling decision, was to be applied retroactively. *State v. Osbey*, 238 Kan. at 283. Here, as in *Osbey*, the defendant raises an issue concerning the word "immediate" used in the self-defense instruction. The *Hundley* decision, rendered while *Osbey* was pending, was also rendered during the pendency of this case. The case before us today and *Osbey*

and *Hundley* are similar cases, all involving a battering relationship and the claim of self-defense.

Here, the defendant was convicted on December 14, 1984, and filed a motion for a new trial on December 21, 1984. That motion was denied on January 9, 1985, and on January 11, 1985, this court announced the decision in *Hundley*. On January 14, 1985, defendant herein filed a motion to reconsider her earlier motion for a new trial. The trial court denied defendant's motion on January 24, 1985, and on the same day she filed her notice of appeal. Our ruling in *Osbey* is also applicable here, and *Hundley* will be applied retroactively to this case.

Because defendant did not object at the trial to the instruction given, our review on appeal is limited to whether the instruction is clearly erroneous. K.S.A. 22-3414(3); *State v. Osbey*, 238 Kan. at 283-84; *State v. Craven*, 215 Kan. 546, 550, 527 P.2d 1003 (1974).

The State contends the instruction was not clearly erroneous, that the difference between the two terms, "imminent" and "immediate" is not of sufficient significance to lead one to a firm conviction of a real possibility that a different verdict might result. The defendant argues, however, the use of the word "immediate" was clearly erroneous because after the jury heard testimony the deceased was lying down at the time of the shooting and was not advancing on the defendant, the jury could only conclude the defendant was in no "immediate" danger.

We held in *State v. Osbey*, 238 Kan. 280, the giving of PIK Crim. 2d 54.17 using the word "immediate" rather than the statutory word "imminent" was clearly erroneous because it precluded the jury from considering the effect of the history of violence inflicted on the appellant by the decedent. The word "immediate" places undue emphasis on the decedent's immediate conduct and obliterates the build-up of terror and fear the decedent systematically injected into the relationship over a long period of time. *State v. Hundley*, 236 Kan. at 467-68. The word "immediate" does not conform to the statutory word "imminent," as the State contends. The use of the word "imminent" does not place undue emphasis on the nature and effect of the history of violence. Rather, it allows the jury to determine, based upon all the evidence before it, including the history of violence *and* the events just prior to the shooting, whether defendant's

claim of self-defense was reasonable in light of *all* the circumstances.

The trial court improperly excluded expert testimony on the battered woman syndrome and improperly instructed the jury on self-defense. The judgment of the trial court is reversed and the case is remanded for a new trial.