[Cite as *State v. Reed*, 2023-Ohio-4694.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. William B. Hoffman, P.J. |
| Plaintiff-Appellee | Hon. John W. Wise, J.<br>Hon. Craig R. Baldwin, J. |
| -vs- | Case No. 2023CA00033 |
| CHARLES ALBERT REED | |
| Defendant-Appellant | O P I N I O N |


CHARACTER OF PROCEEDINGS: Appeal from the Stark County Court of Common Pleas, Case No. 2022-CR-1059


JUDGMENT: Affirmed

DATE OF JUDGMENT ENTRY: December 21, 2023


APPEARANCES:


For Plaintiff-Appellee

KYLE L. STONE
Prosecuting Attorney
Stark County, Ohio

CHRISTOPHER A. PIEKARSKI
Assistant Prosecuting Attorney
Appellate Division
110 Central Plaza South, Suite #510
Canton, Ohio 44702-1413

For Defendant-Appellant

JEFFREY JAKMIDES
JULIE JAKMIDES
325 East Main Street
Alliance, Ohio 44601

*Hoffman, P.J.*

{¶1}   Defendant-appellant Charles Albert Reed appeals the judgment entered by the Stark County Common Pleas Court convicting him following jury trial of felonious assault with a firearm specification (R.C. 2903.11(A)(1), (2); R.C. 2941.145(A)) and menacing by stalking (R.C. 2903.211(A)(1)) and sentencing him to an aggregate prison term of nine to twelve years.  Plaintiff-appellee is the state of Ohio.

STATEMENT OF THE FACTS AND CASE

{¶2}   In 2017, Appellant moved in across the street from the victim and his wife. One day shortly after moving in, Appellant asked the victim if he could help the victim move a piece of paneling out of the victim's truck.  The victim declined the offer, and Appellant seemed offended.  Appellant began trying to annoy the victim with his behavior, including barking at the victim's dogs and houseguests, walking up and down the sidewalk clucking like a chicken, mocking the victim's post-surgery limp, mowing his lawn while openly carrying a gun, installing and aiming high-wattage spotlights at the victim's house, and blinding the victim with his car headlights in the morning when the victim attempted to leave for work.

{¶3}   On August 26, 2019, the victim and Appellant engaged in a verbal altercation which turned physical.  Appellant suffered injuries to his face which required medical treatment.  On several occasions thereafter, Appellant pulled out a gun in the presence of others when the victim was outside.  Police were called to the neighborhood multiple times.  In June of 2021, following an alleged rock-throwing incident, Appellant told a Stark County Deputy Sheriff he would hate to have to use the new self-defense law.

{¶4} On May 23, 2022, Appellant and the victim both found themselves at the same gas station in Alliance, Ohio. The victim pulled into the gas station to get a sandwich and a drink for lunch. He saw Appellant's truck parked. The victim walked around the side of the building where he saw Appellant filling water jugs. No words were exchanged, and Appellant immediately pulled out a gun. The victim remained still with his thumbs in his pockets. Appellant shot the victim in the chest.

{¶5} Appellant was indicted by the Stark County Grand Jury with attempted murder, felonious assault and menacing by stalking. Prior to trial, Appellant filed a notice of his intent to claim self-defense. Appellant also filed an expert report of Dr. James Pritchard, which detailed Appellant's significant medical history and advanced the doctor's expert opinion an older person such as Appellant, who has heart disease, ,would fare far worse than a younger person in an altercation if he sustained a fall. The expert opinion opined Appellant could sustain significant or grave consequences from a verbal and/or physical assault, especially if the attacker is twenty years younger, taller, heavier, and in better physical condition.

{¶6} The State filed a motion in limine to prohibit Dr. Pritchard from testifying at trial, to exclude Dr. Pritchard's expert report, and to require Appellant to provide additional evidence of a bona fide belief Appellant was entitled to use self-defense in this case. The trial court found Dr. Pritchard's report did not provide knowledge or expertise beyond that of a lay person as a juror, as a lay person is perfectly capable of comprehending older adults who fall or break bones fare far worse than younger adults, and the 78-year-old Appellant could easily sustain grave consequences from an altercation with the younger, heavier victim. The trial court granted the State's motion in part, allowing Dr. Pritchard to

testify as to Appellant's significant medical history, but precluding his testimony as to the potential consequences of an altercation between Appellant and the victim and its effect on Appellant's state of mind at the time of the shooting.

{¶7}   The case proceeded to jury trial.   At trial, Dr. Pritchard testified about Appellant's significant medical history, including prostate cancer, heart disease, lung disease, hypertension, prediabetes, and Agent Orange exposure.  Appellant testified at trial he obtained a concealed carry permit following a mass shooting during the Batman movie in Colorado.  Appellant testified the victim referred to him as "dick head," while he called the victim "pecker head."  Tr. (3A) 208.  Appellant testified he heard the victim had told a deputy sheriff if Appellant ever pulled a gun on the victim, the victim would shove the gun up Appellant's ass.  Tr. (3A) 214.  Appellant believed something was going to happen with the victim, and so he began carrying his gun.  Appellant said following the physical altercation in 2019, the victim threatened to beat him up again.

{¶8}   On the day of the shooting, Appellant testified the victim pulled his vehicle next to Appellant at the gas station, rolled down the window, and said, "Hey, dick head." Tr. (3A) 221.  Appellant was apprehensive, but the victim pulled out of the gas station. Appellant testified the victim then turned around, returned to the gas station, got out of his vehicle, and started walking toward Appellant.  Because the victim's thumb was in his pocket, Appellant testified he did not know if he was reaching for a weapon.   When Appellant pulled his own pistol out, he said the victim didn't raise his hands or say not to shoot, and Appellant thought the victim was going to assault him.  Appellant then shot the victim.  Appellant testified his health was not good, and he feared for his life if he went through another beating from the victim.

**{¶9}**   While the jury deliberated, Appellant made the following proffer:

MR. JAKMIDES: Yeah, this is Jeff Jakmides.  I would proffer that if I had been permitted to ask Dr. James Pritchard hypothetical questions, I would have asked him question number one:  Given the information you have about Charlie Reed, I would ask you, if – hypothetically if he was yelled at or put in a position of stress, within a reasonable degree of medical certainty, could that be fatal?

Dr. Pritchard would have answered yes.

I also wanted to ask Dr. Pritchard a hypothetical question that given the medical conditions of Charlie Reed, within a reasonable degree of medical certainty, could Charlie Reed suffer death as a result of being pushed down?

He would have answered yes.

And then finally I would have asked Dr. James Pritchard a hypothetical question that given Charlie Reed's conditions, within a reasonable degree of medical certainty, could he be killed by a blow to any part of his body or any part of his head?

Dr. Pritchard would have answered that question yes as well.

Tr. (3B)86-87.

**{¶10}** The jury found Appellant not guilty of attempted murder, and guilty of felonious assault and menacing by stalking.  The trial court sentenced Appellant to a term

of six to nine years incarceration for felonious assault, three years incarceration for the firearm specification, to be served consecutively to the sentence for felonious assault, and eighteen months incarceration for menacing by stalking, to be served concurrently to the sentence for felonious assault, for an aggregate term of incarceration of nine to twelve years.  It is from the March 24, 2023 judgment of the trial court Appellant prosecutes his appeal, assigning as error:


THE TRIAL COURT ERRED IN PRECLUDING DEFENDANT'S EXPERT FROM TESTIFYING REGARDING THE POSSIBILITY THAT RELATIVELY MINOR CONFRONTATIONS COULD PROVE FATAL TO THE DEFENDANT DUE TO HIS FAILING HEALTH.  TO ESTABLISH SELF-DEFENSE, DEFENDANT WAS REQUIRED TO SHOW A BELIEF THAT HE WAS IN IMMINENT DANGER OF DEATH OR GREAT BODILY HARM AND THAT SUCH BELIEF WAS OBJECTIVELY REASONABLE UNDER THE CIRCUMSTANCES.  DR. PRITCHARD'S TESTIMONY REGARDING DEFENDANT'S MEDICAL HISTORY AND PHYSICAL CONDITION WAS OFFERED TO DEMONSTRATE THAT HIS BELIEF WAS OBJECTIVELY REASONABLE, AND BY PRECLUDING DR. PRITCHARD FROM DRAWING THAT CONNECTION THE TRIAL COURT IMPROPERLY EXCLUDED EVIDENCE CRITICAL TO THE DEFENDANT'S CASE.

**{¶11}** Appellant claimed self-defense at trial.  The elements of self-defense in the use of deadly force are: (1) the defendant was not at fault in creating the situation giving rise to the affray; (2) the defendant had a bona fide belief he was in imminent danger of death or great bodily harm and his only means of escape from such a danger was in the use of such force, and (3) the defendant did not violate any duty to retreat or avoid the danger.[1] *State v. Barnes*, 94 Ohio St.3d 21, 24, 759 N.E.2d 1240 (2002).

**{¶12}** The second element of self-defense requires the evidence tends to show the accused had reasonable grounds to believe or an honest belief, even if mistaken, he or another was in imminent or immediate danger of death or great bodily harm. In *State v. Thomas,* the Ohio Supreme Court explained:

> [T]he second element of self-defense is a combined subjective and objective test. As this court established in *State v. Sheets* (1926), 115 Ohio St. 308, 310, 152 N.E. 664, self-defense "is placed on the grounds of the bona fides of defendant's belief, and reasonableness therefor, and whether, under the circumstances, he exercised a careful and proper use of his own faculties." (Emphasis sic.) See, also, *McGaw v. State* (1931), 123 Ohio St. 196, 174 N.E. 741, paragraph two of the syllabus. In *Koss*, we once again stated this test by approving similar jury instructions to those given in the case sub judice:
>
> > "In determining whether the Defendant had reasonable grounds for an honest belief that she was in imminent danger, you must put yourself in

---

[1] In the instant case, Appellant had no duty to retreat pursuant to R.C. 2901.09 because he was in a place where he lawfully had a right to be.

the position of the Defendant * * *. You must consider the conduct of [the assailant] and determine if such acts and words caused the Defendant to *reasonably* and *honestly* believe that she was about to be killed or to receive great bodily harm.' " (Emphasis added.) *Koss*, 49 Ohio St.3d at 216, 551 N.E.2d at 973. Thus, the jury first must consider the defendant's situation objectively, that is, whether, considering all of the defendant's particular characteristics, knowledge, or lack of knowledge, circumstances, history, and conditions at the time of the attack, she *reasonably* believed she was in imminent danger. See 1 LaFave & Scott, Substantive Criminal Law (1986, Supp. 1996) 654, Supp. 71, Section 5.7. See, also, generally, *State v. Shane* (1992), 63 Ohio St.3d 630, 634, 590 N.E.2d 272, 276 ... Then, if the objective standard is met, the jury must determine if, subjectively, this particular defendant had an honest belief that she was in imminent danger. See 1 LaFave & Scott, Substantive Criminal Law (1986, Supp. 1996) 654, Supp. 71, Section 5.7. See, also, generally, *Shane, supra,* 63 Ohio St.3d at 634, 590 N.E.2d at 276.... 77 Ohio St.3d 323, 330-331, 673 N.E.2d 1339 (1997).

{¶13} Appellant argues the trial court erred in excluding Dr. Pritchard's testimony concerning the medical outcome to Appellant of an altercation with a man the victim's age and size, as such evidence would have demonstrated Appellant reasonably believed his life was in danger when he shot the victim.

{¶14} "A trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence." *Rigby v. Lake Cty.,* 58 Ohio St.3d 269, 271, 569 N.E.2d 1056 (1991).

{¶15} Evid. R. 702(A) provides a witness may testify as an expert if the "witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons." The trial court found the testimony proffered in the instant case did not relate to matters beyond the knowledge or experience possessed by lay persons, and did not dispel a misconception common among lay persons.

{¶16} Appellant relies on the Ohio Supreme Court's opinion in *State v. Koss*, 49 Ohio St.3d 213, 551 N.E.2d 970 (1990), in support of his argument expert testimony was admissible on the issue of whether his belief he was in imminent danger from the victim was reasonable. In *Koss*, the court found testimony concerning battered women's syndrome was admissible on the issue of self-defense:

> Expert testimony regarding the battered woman syndrome can be admitted to help the jury not only to understand the battered woman syndrome but also to determine whether the defendant had reasonable grounds for an honest belief that she was in imminent danger when considering the issue of self-defense. "Expert testimony on the battered woman syndrome would help dispel the ordinary lay person's perception that a woman in a battering relationship is free to leave at any time. The

expert evidence would counter any 'common sense' conclusions by the jury that if the beatings were really that bad the woman would have left her husband much earlier. Popular misconceptions about battered women would be put to rest, including the beliefs that the women are masochistic and enjoy the beatings and that they intentionally provoke their husbands into fits of rage. See Walker, The Battered Woman, 19–31 (1979)." *State v. Hodges* (1986), 239 Kan. 63, 68–69, 716 P.2d 563, 567. See, also, *Smith v. State, supra*, 247 Ga. at 618–619, 277 S.E.2d at 683; *Hawthorne, supra; Torres, supra*, 128 Misc.2d at 133–134, 488 N.Y.S.2d at 362.

As the Supreme Court of New Jersey stated in *State v. Kelly, supra,* 97 N.J. at 193, 478 A.2d at 371:

"[']Battered women include wives or women in any form of intimate relationships with men. Furthermore, in order to be classified as a battered woman, the couple must go through the battering cycle at least twice. Any woman may find herself in an abusive relationship with a man once. If it occurs a second time, and she remains in the situation, she is defined as a battered woman.[']" (Quoting Walker, The Battered Woman [1979], at xv.)

" * * * [E]xpert testimony would be essential to rebut the general misconceptions regarding battered women.

"The difficulty with the expert's testimony is that it sounds as if an expert is giving knowledge to a jury about something the jury knows as well as anyone else, namely, the reasonableness of a person's fear of imminent serious danger. That is not at all, however, what this testimony is *directly*

aimed at. It is aimed at an area where the purported common knowledge of the jury may be very much mistaken, an area where jurors' logic, drawn from their own experience, may lead to a wholly incorrect conclusion, an area where expert knowledge would enable the jurors to disregard their prior conclusions as being common myths rather than common knowledge." (Emphasis sic) *Kelly, supra*, at 206, 478 A.2d at 378.

**{¶17}** *Id.* at 216–17, 551 N.E.2d at 973–74.

**{¶18}** The Ohio Supreme Court later extended the holding in *Koss* to child abuse situations, finding testimony on the syndrome or psychological effects of abuse is essential to proving the elements of a self-defense claim, because nonconfrontational killings do not fit the general pattern of self-defense. *State v. Nemeth*, 82 Ohio St.3d 202, 208, 694 N.E.2d 1332 (1998). Without expert testimony, a trier of fact may not be able to understand the defendant at the time of the killing could have had an honest belief he was in imminent danger of death or great bodily harm, and it is difficult for the average person to understand the degree of helplessness an abused child may feel. *Id.* Thus, expert testimony would help dispel the ordinary lay person's perception that a [person] in a battering relationship is free to leave at any time. *Id.*

**{¶19}** In both *Koss* and *Nemeth*, the expert testimony aided the jury in dispelling a common misconception a woman or child in an abusive relationship is free to leave any time. However, in the instant case, no such misconception exists. It is not a commonly held belief an older person with numerous health problems is no more susceptible to death from an altercation than a younger person in good health. Dr. Pritchard testified

at trial as to numerous health conditions from which Appellant suffered.  Appellant testified because of his poor health, he feared for his life should he have another physical altercation with the victim.   Further, the jury heard testimony from both the victim and Appellant, and was in a position to physically see the differences in age, size, and physical condition between the two men.  As found by the trial court, expert testimony was not necessary for a lay person to understand the potential fragility of an older person in poor health who is involved in a verbal or physical altercation, and to evaluate the objective reasonableness of Appellant's belief he was in imminent danger of death or bodily harm if engaged in an altercation with the victim.   We find the trial court did not err in finding Dr. Pritchard's opinion was not admissible under Evid. R. 702(A), as the proffered testimony was not beyond the knowledge or experience of a lay person and did not dispel any misconception common amongst lay persons.

{¶20}  Appellant also argues the State opened the door for expert testimony in the following exchange during the State's cross-examination of Dr. Pritchard:

Q: Okay.  So you had said that you're shocked that someone could have so many ailments and still be alive; yet it doesn't surprise you that he lived on his, on his own?

A: I never said I was shocked

Q: Well, I think that's ex –

A: I said I, I never saw anybody that had as many – that – people that were alive that had as many diagnosis (sic) that he has and that I expect him to die any day.

Q: So those are based on records from Ju – July of 2022 and yet here we are all these months later?

A: No, it's not based on that. It's based on all my medical knowledge and all my years of education and my time in the coroner's office and reading medical literature about people just exactly like Mr. Reed that's (sic) been taking aspirin, that has (sic) minor injuries, that die from bumps on their head in the car doors.

**{¶21}** Tr. (3A) 172-73.

**{¶22}** The prosecutor's objection to this answer was sustained, and the statement was stricken from the record.

**{¶23}** We find the prosecutor did not open the door by cross-examining the doctor on his testimony he was surprised Appellant was still alive. Under the "opening the door' doctrine, the introduction of inadmissible evidence by one party allows an opponent, in the court's discretion, to introduce evidence on the same issue to rebut any false impression which might have resulted from the earlier admission. *State v. Gordon,* 5th Dist. Stark No. 2017CA00073, 2017-Ohio-9357, ¶ 25. In the instant case, Dr. Pritchard's testimony was not in response to any inadmissible evidence presented by the State. Rather, he delved into areas previously deemed inadmissible by the court in response to questioning by the State.

{¶24} The assignment of error is overruled. The judgment of the Stark County Common Pleas Court is affirmed.


By: Hoffman, P.J.

Wise, J. and

Baldwin, J. concur