Nelda Bailey LANE, Appellant,

v.

The STATE of Texas, Appellee.

No. 05–95–01077–CR.

Court of Appeals of Texas, Dallas.

Aug. 28, 1997.

---

culpable mental state in the application paragraph of the court's charge, and (3) excluding expert testimony on the "battered wife syndrome" during the guilt/innocence phase of trial. For the reasons set forth below, we affirm the trial court's judgment.

## BACKGROUND

Appellant and William Lane were married for over thirty-two years and had one daughter, Ginger Varga. William was an alcoholic and an avid hunter. During the course of their marriage, William verbally abused appellant and, on several occasions, he physically abused her. Following one of the instances of physical abuse in 1980, appellant left William, filed for divorce, and obtained a temporary restraining order. Four months later, William promised to quit drinking, and appellant returned to him. The last instance of physical abuse occurred in 1981.

In March 1995, the situation between appellant and William worsened considerably. Their advertising business failed. William was very depressed and was drinking heavily. While William was away on a fishing trip, appellant moved out of the couple's home and moved in with Ginger and her family. Appellant took William's gun when she moved out because she thought William might try to kill himself.

Shortly after appellant moved in with Ginger, Ginger and her family left for a ski trip. On the day they left, William went to Ginger's house. William and appellant talked until William abruptly left around 3:30 a.m. A few hours later, William called appellant and told her he wanted to know by Saturday night if she would come back to him. William called two more times that day.

The second call came about 10:30 p.m. and lasted over two hours. Appellant could tell William was drinking heavily. He begged appellant to come back to him, and she repeatedly said no. As the conversation continued, William's speech became more violent. Then, William abruptly became very quiet. He told her at that time, in a very calm and cold voice, that he was going to kill her. William graphically described how he would slit her open like a wild animal and

Jan E. Hemphill, Dallas, for Appellee.

Michael J. Sandlin, Asst. Dist. Atty., Dallas, for State.

Before LAGARDE, WHITTINGTON and JAMES, JJ.

## OPINION

WHITTINGTON, Justice.

Nelda Bailey Lane appeals her conviction for murder. After appellant pleaded not guilty, the jury found appellant guilty and sentenced her to ten years' confinement. In three points of error, appellant contends the trial judge erred in (1) failing to charge the jury on self-defense, (2) failing to include a

pull her guts out. William told appellant he would track her down. He also said he would kill Ginger. According to appellant, William had never threatened to kill her before. The phone conversation ended around 12:30 a.m.

Appellant paced the floor all night. Appellant finally decided that if she did not kill William, he would kill her and possibly their daughter. At approximately 5:00 a.m., appellant took the gun she had taken when she moved out, got in her car, and drove the eight miles to the couple's home. The drive took approximately twenty minutes. Appellant could hear William snoring as she entered the house. After determining that William was asleep, she walked into the bedroom and shot him three times in the head. Appellant then called her daughter in Colorado and called the police.

## SELF–DEFENSE CHARGE

In her first point of error, appellant contends the trial judge erred in failing to charge the jury on self-defense. Under this point, appellant contends she was entitled to submission of a self-defense charge because her testimony showed she was acting in self-defense when she shot William. We disagree.

Under section 9.31(a) of the Texas Penal Code, a person is justified in using force against another if she reasonably believes the force is immediately necessary to protect herself against the other's use or attempted use of unlawful force. TEX. PENAL CODE ANN. § 9.31(a) (Vernon 1994); McCray v. State, 861 S.W.2d 405, 407 (Tex.App.—Dallas 1993, no pet.). Under section 9.32 of the penal code, a person is justified in using deadly force only if a reasonable person in the actor's situation would not have retreated, and the actor reasonably believes that deadly force is immediately necessary to protect herself against another's use or attempted use of unlawful deadly force. TEX. PENAL CODE ANN. § 9.32(a)(2) & (3) (Vernon 1994). However, under section 9.31(b)(1), the use of

force is not justified in response to verbal provocation alone. TEX. PENAL CODE ANN. § 9.31(b)(1) (Vernon 1994).

Here, the evidence shows that William was asleep in a house miles away from appellant when she decided to use deadly force against him. According to the evidence, appellant had to drive eight miles, a distance which took approximately twenty minutes, to kill William. There is no evidence that William took any physical actions against appellant that would have warranted her in believing that deadly force was immediately necessary to protect herself. To the contrary, appellant relies only on the verbal threats William made over the phone almost five hours before the shooting to justify the submission of a self-defense charge. As noted above, verbal threats alone do not justify the use of force against another. TEX. PENAL CODE ANN. § 9.31(b)(1) (Vernon 1994); Hamel v. State, 916 S.W.2d 491, 494 (Tex.Crim.App. 1996).[1] Because the evidence in this case shows nothing more than verbal threats made to appellant, we conclude the evidence did not raise the issue of self-defense. Accordingly, the trial judge did not err in refusing appellant's requested charge.

In reaching our decision, we necessarily reject appellant's reliance on the court of criminal appeals's opinion in Hamel. Appellant cites Hamel for the proposition that self-defense can be used to protect oneself from apparent danger as well as from real danger. We do not disagree with this interpretation of Hamel; however, the facts of Hamel also show that, in addition to verbal threats, the deceased made a physical act (i.e., walking towards a car where the deceased said he had a gun) before the defendant stabbed the deceased. Hamel stands for the proposition that the use of force is not justified in response to verbal provocation alone. See Hamel, 916 S.W.2d at 494 (noting that deceased's move towards car was physical act that rendered conduct more than mere threat). Accordingly, Hamel supports our conclusion that a charge on the issue of self-

1. Although appellant argues that William's drinking, when coupled with the verbal threats, was sufficient to show an "overt act" that justified the use of force, we disagree. Appellant cites no authority, and we have found none, indicating that drinking alcohol, even to the point of intoxication, can constitute the physical act necessary to justify the use of force. We decline to so hold.

defense was not appropriate in this case. *See also Halbert v. State*, 881 S.W.2d 121, 124 (Tex.App.—Houston [1st Dist.] 1994, pet. ref'd) (concluding issue of self-defense raised in case that included not only verbal threats, but also physical act by deceased of advancing toward defendant).

For the reasons stated, we overrule appellant's first point of error. Our disposition of appellant's first point of error makes it unnecessary for us to consider the argument in her third point of error that the trial judge erred in excluding expert testimony on the effects of "battered women's syndrome" during the guilt/innocence stage of trial. TEX. R.APP. P. 90(a).[2]

## CULPABLE MENTAL STATE

In her second point of error, appellant contends the trial judge erred in failing to include a culpable mental state in the application paragraph of the court's charge to the jury. Under this point, appellant contends we must reverse her conviction because the omission of a culpable mental state denied her a fair and impartial trial. We disagree.

We note initially that appellant did not object at trial to the omission in the court's charge. Under these circumstances, a reversal is warranted only if the appellant can show the error caused her egregious harm, *i.e.*, that she was denied a fair and impartial trial. *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App.1985) (op. on reh'g). To determine whether egregious harm occurred, we examine the entire jury charge, the state of the evidence, including the contested issues and the weight of probative evidence, the argument of counsel, and any other information contained in the record. *Almanza*, 686 S.W.2d at 171. Failing to include a culpable mental state in an appli-

cation paragraph does not deny a defendant a fair and impartial trial when the defendant's culpable mental state is not a contested issue. *Dedesma v. State*, 806 S.W.2d 928, 933 (Tex.App.—Corpus Christi 1991, pet. ref'd).

Here, the abstract portion of the court's charge properly set forth the elements of murder, including the required mental state. Thus, when viewed in its entirety, the court's charge informed the jury of the mental state required for commission of the charged offense. In addition, we note that appellant admitted at trial that she knowingly and intentionally shot William. Accordingly, her culpable mental state was not a contested issue at trial. Under these circumstances, we fail to see how the failure to include the culpable mental state in the application paragraph could have caused appellant egregious harm. *See Dedesma*, 806 S.W.2d at 933. We overrule appellant's second point of error.

For the reasons stated, we affirm the trial court's judgment.

JAMES, J., dissenting.

JAMES, Justice, dissenting.

Because I disagree with the majority's conclusion that appellant responded to verbal provocation alone, I respectfully dissent. I think the current interpretation of the statutes defining self-defense is unduly restrictive and I propose a broader interpretation of sections 9.31 and 9.32 of the Texas Penal Code. Under a broader interpretation, the jury could consider not only the deceased's words and actions the night of the offense, but also the history of abuse, the abuser's characteristics, and appellant's perception of the situation.

---

2. This review is unnecessary because even if testimony regarding "battered women's syndrome" showed that appellant was justified in believing she could not retreat from the situation, it would not provide the overt physical act required for submission of a self-defense charge. Appellant makes no argument that the excluded evidence would have provided evidence of an overt physical act. In addition, although appellant suggests in her brief that the evidence might have been

relevant to the issue of sudden passion, we note that under the law applicable to this case, sudden passion was an issue to be determined at punishment and the complained-of evidence *was* admitted during punishment. *See* TEX. PENAL CODE ANN. § 19.02(d) (Vernon 1994). Appellant did not object in the court below that the charge was incomplete because it failed to include an issue on sudden passion, and appellant has not complained about this omission on appeal.

Briefly, I set out the following details of Nelda and Bill's marriage, which are primarily from Nelda's testimony. Nelda and Bill married in 1963. They had one child, Ginger. In 1965, Bill forcefully struck Nelda for the first time. In 1966, Bill grabbed Nelda by the throat and threw her on the bed during an argument.

In August of 1980, Bill came home late after drinking heavily. Bill verbally abused Nelda, struck her, and shoved her onto the bed. According to Ginger, Bill yelled at Nelda because she did not have dinner ready. Ginger heard crashing noises from her bedroom and Nelda pleading with Bill to stop and not hurt her. After several hours, Ginger left her room. Bill grabbed Ginger and threw her on the couch. Finally, Ginger escaped to a neighbor's house and called the police. That night, Nelda and Ginger left. Ginger never returned home. She did not want to live with her father anymore because she believed he was an alcoholic and was tired of his unprovoked verbal and physical abuse of her mother. Nelda filed for divorce and obtained a temporary restraining order. Four months later, she dismissed the suit after Bill promised he would quit drinking. Less than a year later, Bill started drinking again.

Nelda described her daily routine with Bill. For example, Bill expected her to clean his eyeglasses every morning. If she did not clean them to his satisfaction, Bill would ignore her the rest of the day. Bill also expected Nelda to have his meals ready for him at whatever odd hours he came home. If Bill was not satisfied with the dinner, he threw his plate across the kitchen, strewing food in its path.

Nelda described Bill as a professional hunter, who kept several guns and knives in the house. Bill showed Nelda pictures of animals after they had been field dressed, some of which he enlarged to display on the walls alongside trophy heads.

On March 6, 1995, Bill decided to go fishing and demanded Nelda give him a hundred dollars for his trip. When Nelda told him they had no funds, Bill demanded she cash a check on her mother's bank account. Nelda refused, but after arguing for an hour, she yielded to his demand. At this point, Nelda testified she knew their marriage was finished.

On Friday, March 10, 1995, Nelda decided to leave Bill while he was at the lake. Ginger helped Nelda pack and suggested she take a gun for protection. Ginger worried about her mother's safety because she and her family would be leaving for a Colorado ski vacation on Wednesday and would not return until Sunday. Bill knew about the family ski trip, which meant he would know Nelda remained at Ginger's house alone.

On Saturday morning, Bill called Ginger's house from the lake. Nelda told him she had moved out. Two hours later, Bill called again. This time, however, Bill had returned home. On Wednesday at approximately 5:30 p.m., Bill arrived at Ginger's house after she and her family had left on their trip. Nelda said he looked normal and although she smelled alcohol on his breath, he did not appear drunk. Bill talked to Nelda approximately ten hours before leaving.

At approximately 6:00 a.m. Thursday morning, Bill called, played a song for Nelda, and hung up the phone. Thirty minutes later, Bill called again. He wanted Nelda to decide by Saturday night whether she would reconcile. Nelda told Bill she would never reconcile with him. After 3 p.m., Bill called again and they talked until 8 p.m. Between 10 p.m. and 10:30 p.m., Bill called and begged Nelda to come back. Although he did not sound drunk when he called, he told Nelda he was getting drunk and continually poured liquid in a glass and swallowed it so she could hear. He repeated the ultimatum that she had until Saturday night to make her final decision.

Nelda testified that after an hour, Bill's manner suddenly changed. He calmly stated, "Nelda, I'm going to kill you." He told Nelda he was going to get her and slit her open like a wild animal, "just like the deer down there on the ranch." He told her "I'm going to cut you open and I'm going to pull your guts out." Bill said he would find her if she went to any friends' or relatives' house and would kill anyone who got in his way.

He told her she could be driving a car and he would "head shoot [her] just like JFK."

While trying to calm Bill, Nelda decided to flee to her cousin's house in Tyler. Because she was talking on a cordless telephone, she moved about and began packing a bag for the trip. Although Nelda said nothing of her plans, Bill anticipated her actions. He said he would get her even if she went to Tyler.

Although Nelda continued to try and calm Bill, he kept repeating his graphic threats. Bill said, "If I were [you] I would get one of Nick's guns" and "blow my brains out." He said it would be better to blow her brains out because it would be a lot easier on her than what he planned to do. Bill also threatened Ginger. He said, "I'll get your f—— daughter, too." Bill's last words to Nelda were, "You're dead meat, bitch."

Nelda testified that Bill had never before threatened to kill her. She believed Bill was serious and would carry out his threats.[1] At approximately 5:30 a.m. on Saturday morning, Nelda removed the gun and placed it in her bag. She drove the eight-mile distance to their house on Emrose Terrace, which took approximately twenty minutes. Nelda entered their house, walked to the bed where Bill was sleeping, and fired one shot. Nelda saw Bill's body move and fired twice more.[2]

The trial court excluded Dr. James P. Grigson's testimony at the guilt/innocence stage, which appellant wanted to introduce in support of her self-defense claim. The trial court allowed Dr. Grigson's testimony, however, during the sentencing phase.[3] The following testimony is a summary of Dr. Grigson's opinion concerning the characteristics of battered spouses in relation to Nelda's state of mind.

After examining Nelda on March 31, 1995, Dr. Grigson concluded she had the character-istics of a spouse who suffered from mental and verbal abuse and would qualify as a battered spouse. Essentially, Dr. Grigson testified that a person in the same situation as Nelda would have had a reasonable fear of death after being threatened, would have thought deadly force immediately necessary to defend herself against her husband's threats, would believe killing her husband while sleeping was the only way to protect her and her daughter's life, and would feel as if she could not escape because wherever she went, her husband would find her.

In her first point of error, appellant contends the trial court erred by failing to charge the jury on self-defense. The majority concludes the evidence did not raise the issue of self-defense because appellant responded to verbal provocation alone. Specifically, the majority concludes that before a defendant may act in self-defense, he must not only be threatened with death or serious injury, but also confronted by the deceased with some physical act to carry out the threat. I disagree. I do not construe the language of section 9.31(b)(1) so narrowly as to limit "alone" to imminent physical actions by the deceased.

Section 9.32 of the Texas Penal Code allows a person to use deadly force:

(1) if he would be justified in using force against the other under Section 9.31;

(2) if a reasonable person in the actor's situation would not have retreated; and

(3) when and to the degree he reasonably believes the deadly force is immediately necessary:

(A) to protect himself against the other's use or attempted use of unlawful deadly force.

TEX. PENAL CODE ANN. § 9.32 (Vernon Supp. 1997). Section 9.31 states that a person is

---

1. Two of Bill's friends testified that Bill had talked to them after Nelda left him on March 10, 1995. On March 13th, Bill said he was going to "gut the bitch" and at one point Bill said he wanted to "put a hit" on Nelda.

2. The medical examiner found that Bill had a 0.12 blood alcohol level and elements of various drugs in his bloodstream including antidepressants, sedatives, and small amounts of Librium, a drug commonly used by alcoholics.

3. Both the State and appellant stipulated that Dr. Grigson's testimony at the sentencing phase constituted appellant's offer of proof. Dr. Grigson's testimony at the sentencing phase is our reference from which we summarize what the substance of his testimony would have been if allowed at the guilt/innocence phase.

"justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force." TEX. PENAL CODE ANN. § 9.31(a) (Vernon Supp.1997). The use of force is not justified, however, in response to verbal provocation alone. *Id.* § 9.31(b)(1).

The accused is entitled to an instruction on self-defense when the evidence raises the issue, no matter whether the evidence is strong, feeble, unimpeached or contradicted, and even if the trial court is of the opinion the testimony is not entitled to belief. *See Sanders v. State,* 707 S.W.2d 78, 80 (Tex. Crim.App.1986); *Dyson v. State,* 672 S.W.2d 460, 463 (Tex.Crim.App.1984). The accused's testimony alone may raise a defensive issue. *Dyson,* 672 S.W.2d at 463. The issue is not whether the testimony is true; that question is for a jury. *See Rodriquez v. State,* 544 S.W.2d 382, 383 (Tex.Crim.App.1976).

There is little caselaw discussing verbal provocation. As such, I find the court's analysis in *Jones v. State,* 544 S.W.2d 139, 142 (Tex.Crim.App.1976), instructive. In *Jones,* the deceased followed his wife to appellant's house. *Id.* at 140. Appellant stood in the yard holding a shotgun. *Id.* Appellant did not know whether the deceased had a weapon. *Id.* As the deceased moved closer, appellant shot three times. *Id.* The trial court submitted a self-defense instruction. *Id.* at 141. The trial court refused, however, to charge the jury on the law of apparent danger. *Id.*

The court held that the jury need not find the deceased actually used or was attempting to use deadly force against the defendant. *See id.* at 142–43. Instead, the jury could consider whether the defendant reasonably believed, as viewed from his standpoint at the time, deadly force was immediately necessary to protect himself against the use or attempted use of unlawful deadly force by the deceased. *Id.* This language comports with the meaning of section 9.31(a), which allows a person to act in self-defense if he reasonably believed force was immediately necessary. *See* TEX. PENAL CODE ANN. § 9.31 (Vernon Supp.1997). Therefore, before acting in self-defense, it is not necessary that a person actually use deadly force against the defendant. Instead, a person may act in self-defense if the danger is apparent to him, whether actual or not.

Applying the same reasoning to section 9.31(b)(1), I would conclude an actual physical act by the deceased is not the only evidence that satisfies the requirement of responding to more than verbal threats alone. In this case, Nelda testified she believed she could not escape the imminent attack of her abusive husband if she did not act before he awoke. She believed once Bill awoke, he would carry out his threats to kill and eviscerate her. Viewing the evidence from Nelda's standpoint, I think she at least raised the issue of whether she responded to verbal provocation alone. Moreover, Bill's detailed, graphic threats and the long history of both physical and mental abuse that occurred when Bill had been drinking raise the issue that Nelda reasonably believed deadly force was immediately necessary.

Therefore, I would conclude appellant at least raised the issue of whether she reacted to verbal provocation alone and whether she reasonably believed force was immediately necessary. The factfinder should have the opportunity to view Nelda's actions in response to Bill's threats in the same way a factfinder determines whether a defendant's view of apparent danger was reasonable. This inquiry should be a part of the factfinder's determination of whether the defendant acted in self-defense.

I briefly address whether a reasonable person in Nelda's situation would not have retreated. The majority did not reach this issue because they concluded Nelda reacted to verbal provocation alone.

The jury must consider whether the defendant had the ability and opportunity to retreat in light of all the circumstances at the moment. *Valentine v. State,* 587 S.W.2d 399, 402 (Tex.Crim.App.1979). Some evidence of the inability to retreat is all that is necessary. *Halbert,* 881 S.W.2d 121, 125 (Tex.App.— Houston [1st Dist.] 1994, pet. ref'd). "[I]t is contemplated that the fact-finder will make a moral judgment on whether a defendant in a specific case ought to have retreated before threatening or using deadly force." *Valen-*

*tine,* 587 S.W.2d at 402 (quoting TEX. PENAL CODE ANN. § 9.32 cmt.).

In this case, the jury must place themselves in Nelda's position at the time she decided to shoot her husband. Nelda and Bill talked almost continuously for sixty hours with little or no sleep. Bill threatened to kill her and described how he would do so in graphic terms. Bill anticipated Nelda would go to Tyler and said he would get her there, too. Nelda thought if she attempted to flee, Bill would hunt her down and kill her. Moreover, Dr. Grigson stated that a battered wife in Nelda's situation would not have retreated.

Considering Nelda and Bill's previous history, there is some evidence a reasonable person in Nelda's situation would not have retreated. The obligation to retreat embodies something more than leaving the scene of the confrontation. Retreat without a reasonable belief the actor can escape the imminent threat of harm is not required. *See Hamel v. State,* 916 S.W.2d 491, 494 (Tex.Crim.App. 1996).

I would conclude Nelda offered some evidence, no matter how weak, or even credible, that she did not respond to verbal provocation alone, she reasonably believed deadly force was immediately necessary to protect herself, and a reasonable person in Nelda's situation would not have retreated. A factfinder should decide whether a person, who was a battered spouse, acted in self-defense under these circumstances. Thus, the trial court erred in failing to submit an instruction on self-defense.

When the error in the court's charge is the subject of a timely objection, reversal is required if the error was calculated to injure the rights of the defendant. *See Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim.App. 1984); *see also Porter v. State,* 873 S.W.2d 729, 735 (Tex.App.—Dallas 1994, pet. ref'd). Reversal is required if *some* harm to the accused is shown. *Porter,* 873 S.W.2d at 735. In this case, the jury convicted appellant of murder. The omission of the instruction precluded the jury from finding appellant acted in self-defense. Nelda admitted she killed Bill. The only contested issue at trial was whether she acted in self-defense. As such,

I would conclude the trial court's failure to submit the issue of self-defense constituted some harm and sustain appellant's first point of error.

In her third point of error, appellant contends the trial court erred in excluding Dr. Grigson's testimony during the guilt/innocence phase. At trial, appellant argued Dr. Grigson's testimony was relevant pursuant to article 38.36 of the Texas Code of Criminal Procedure, explained her state of mind, and assisted the trier of fact.

An appellate court reviews a trial court's ruling on the admissibility of evidence for abuse of discretion. *Cohn v. State,* 849 S.W.2d 817 (Tex.Crim.App.1993). An abuse of discretion will be found "only when the trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *Cantu v. State,* 842 S.W.2d 667, 682 (Tex.Crim.App. 1992), *cert. denied,* 509 U.S. 926, 113 S.Ct. 3046, 125 L.Ed.2d 731 (1993).

Article 38.36 of the Texas Code of Criminal Procedure makes expert testimony admissible concerning acts of family violence committed by the deceased and the defendant's state of mind at the time of the offense when a person claims self-defense. *See* TEX. CODE CRIM. PROC. ANN. art. 38.36 (Vernon Supp.1997). At trial, Nelda claimed she acted in self-defense. Because Nelda claimed she acted in self-defense, a material issue existed as to her state of mind. *See Fielder v. State,* 756 S.W.2d 309, 318–19 (Tex.Crim. App.1988). Before the factfinder determines whether a battered spouse had a reasonable belief deadly force was immediately necessary and whether the accused's assessment of the· situation reasonably indicated she could not have retreated, the factfinder must understand the characteristics of a battered spouse. *See id.* at 318. This understanding encompasses knowing about the previous relationship between the deceased and the accused, as well as the characteristics of a battered spouse. Most jurisdictions have concluded expert testimony concerning battering relationships is a subject beyond the understanding of the average juror. *See, e.g., State v. Hodges,* 239 Kan. 63, 716 P.2d 563, 567 (1986). I agree. Because many

laypersons are unable to place themselves in the same position as a battered spouse, expert testimony is imperative when a defendant, who is a battered spouse, claims self-defense.

I conclude the trial court abused its discretion and, therefore, erred in excluding Dr. Grigson's testimony. Pursuant to rule 81(b)(2), the judgment must be reversed if there is an error in the proceeding below unless we determine, beyond a reasonable doubt, that the error made no contribution to the conviction or the punishment. TEX. R.APP. P. 81(b)(2). A harmless error analysis must focus on the error rather than the propriety of the outcome of the trial, trace its probable impact upon the jury, and determine whether it contributed to the conviction or punishment. *See Harris v. State,* 790 S.W.2d 568, 585–87 (Tex.Crim.App.1989). In focusing on the fairness of the trial and integrity of the process, we consider the source and nature of the error, the extent the State emphasized the error, its probable collateral consequences, the weight a juror would probably place on the error, and whether declaring it harmless would likely encourage the State to repeat it with impunity. *Id.* at 587. This analysis requires us to evaluate the entire record in a neutral, impartial, and evenhanded manner, not in the light most favorable to the prosecution. *Id.* at 586.

By excluding Dr. Grigson's testimony at the guilt/innocence stage, the trial court denied appellant her right to present relevant evidence supporting her self-defense claim. The omission of this testimony left the trier of fact to view Nelda's actions in a vacuum. Because the trial court refused to submit an issue concerning self-defense, the jury could only return a guilty verdict. The harm is obvious. I would sustain appellant's third point of error.

Because I would sustain appellant's first and third points of error and reverse and remand this case for a new trial, I need not address appellant's second point of error.

Accordingly, I respectfully dissent.