ACCEPTED
13-15-00101-CR
THIRTEENTH COURT OF APPEALS
CORPUS CHRISTI, TEXAS
12/22/2015 9:10:53 AM
Dorian E. Ramirez
CLERK

## NO. 13-15-00101-CR

### IN THE COURT OF APPEALS
### THIRTEENTH DISTRICT OF TEXAS
### CORPUS CHRISTI, TEXAS

FILED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS

12/22/2015 9:10:53 AM

DORIAN E. RAMIREZ
Clerk

**JAMES SPENCER,**

**Appellant,**

**v.**

FILED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS

12/22/2015 9:10:53 AM

DORIAN E. RAMIREZ
Clerk

**THE STATE OF TEXAS,**

**Appellee**

## STATE'S BRIEF

STEVEN E. REIS
State Bar No. 16757960
sreis@co.matagorda.tx.us
LINDSAY K. DESHOTELS
State Bar No. 24069608
1700 7th Street, Room 325
Matagorda County Courthouse
Bay City, Texas 77414
Telephone:  (979) 244-7657
Telecopier:  (979) 245-9409

ROBINSON C. RAMSEY
State Bar No. 16523700
rramsey@langleybanack.com
Trinity Plaza II, Suite 900
745 E. Mulberry
San Antonio, Texas 78212
Telephone: (210) 736-6600
Telecopier: (210) 735-6889

### ATTORNEYS FOR THE STATE OF TEXAS

**THE STATE DOES NOT REQUEST ORAL ARGUMENT**

# IDENTIFICATION OF PARTIES

| | |
|---|---|
| Appellant: | James Spencer |
| Trial Counsel: | Robert Swofford<br>5225 Katy Freeway, Suite 605<br>Houston, Texas  77007 |
| Appellate Counsel: | Robert Swofford<br>5225 Katy Freeway, Suite 605<br>Houston, Texas  77007 |
| | Joe Gonyea<br>2118 Smith Street<br>Houston, Texas  77002 |
| Appellee: | State of Texas |
| Trial Counsel: | Steven Reis, District Attorney<br>Lindsey Deshotels, Assistant District Attorney<br>Matagorda County District Attorney's Office<br>1700 7th Street, Room 325<br>Bay City, Texas  77414 |
| Appellate Counsel: | Steven Reis, District Attorney<br>Lindsey Deshotels, Assistant District Attorney<br>Matagorda County District Attorney's Office<br>1700 7th Street, Room 325<br>Bay City, Texas  77414 |
| | Robinson C. Ramsey<br>745 E. Mulberry Ave., Suite 900<br>Trinity Plaza II<br>San Antonio, Texas  78212 |
| Trial Court Judge: | Hon. Craig Estlinbaum<br>130th Judicial District Court<br>Matagorda County, Texas |

# TABLE OF CONTENTS

IDENTIFICATION OF PARTIES ................................................................... 1

TABLE OF CONTENTS ............................................................................. 2

TABLE OF AUTHORITIES ....................................................................... 3

STATEMENT OF THE CASE .................................................................... 3

STATEMENT REGARDING ORAL ARGUMENT ......................................... 4

ISSUE PRESENTED ................................................................................ 4

> The trial court correctly refused Spencer's request for a jury instruction on self-defense.

SUMMARY OF THE ARGUMENT................................................................ 11

ARGUMENT............................................................................................ 13

PRAYER ................................................................................................ 19

CERTIFICATION OF COMPLIANCE ......................................................... 20

CERTIFICATE OF SERVICE..................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Dyson v. State,*
     672 S.W.2d 460 (Tex. Crim. App. 1984)............................................. 11, 13
*Halbert v. State,*
     881 S.W.2d 121 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd) ........... 18
*Hamel v. State,*
     916 S.W.2d 491 (Tex. Crim. App. 1996).......................................... *passim*
*Lane v. State,*
     957 S.W.2d 584 (Tex. App.—Dallas 1997, pet. ref'd) .........................13, 18

## Statutes

TEX. PENAL CODE § 9.31 (West 2011)..................................................11, 12, 14

## STATEMENT OF THE CASE

This is a felony criminal case in which a jury, on February 17, 2015, found Appellant James Spencer guilty of aggravated assault with a deadly weapon and recommended punishment of six years in prison plus a ten-thousand-dollar fine. *6 RR 39-43; 7 RR 127-29; CR 104-06.* He filed his notice of appeal on that same date. *CR 102.*

## STATEMENT REGARDING ORAL ARGUMENT

The State does not believe that oral argument would materially assist this court in reaching its decision. Therefore, the State waives oral argument.

## ISSUE PRESENTED

The trial court correctly refused Spencer's request for a jury instruction on self-defense.

## STATEMENT OF FACTS

"[W]e were drinking beer," Jay Howell recalled. "There was a young man, there, but I didn't know his name." *4 RR 156.*

His name was Jared Maxwell. *4 RR 174.*

Maxwell, Howell, James Spencer, and Paul Stillwell were doing "a little drinking" during a cookout on Spencer's porch. *4 RR 173-75.*

"Mr. Spencer and that kid was drinking beer and whiskey," Howell said. "I never seen nothing coming; but the next thing I knew, the kid was sliding down the wall." *4 RR 156.*

"Did you hear commotion or anything behind you?" the prosecutor asked. *4 RR 157.*

"Just whenever he hit it." *4 RR 157.*

"Do you know how the kid hit the wall?" *4 RR 157.*

"Yeah. James throwed him up against it." *4 RR 157.*

"He shoved him back to a door," said Stillwell, "and then he just kind of melted into the concrete." *4 RR 178.*

That was after Maxwell had hit Spencer in the nose—twice. *4 RR 175.*

"Never did know why," Stillwell said. *4 RR 175.*

Maxwell could not remember either. *4 RR 131.*

"Whenever you see the kid hit the wall," the prosecutor asked Howell, "is he conscious or unconscious at that point?" *4 RR 157.*

5

"He passed out." *4 RR 157.*

"What happened next?" *4 RR 157.*

"James went to kicking him in the groin and then put his foot on his throat." *4 RR 157.*

"He was still out cold the whole time?" *4 RR 158.*

He was. *4 RR 158.*

"So, what happened next?" *4 RR 158.*

"Paul drug him over across the street." *4 RR 158.*

Meanwhile, Maxwell was still breathing, but remained unconscious. *4 RR 158.*

"James brought a five-gallon bucket of water and throwed it on the kid," Howell said. "And that's when me and Paul left and went over to get my cell phone at Paul's house so I could call 911." *4 RR 158.*

When Captain Ronald Ballenger arrived in response to the 911 call, he found Maxwell lying in the street unconscious with a "[p]retty bloodied face" and "a good deal of blood draining onto the pavement." *3 RR 30-32.*

Lieutenant Douglas Pruitt, who joined Captain Ballenger shortly thereafter, also described Maxwell as being "in pretty bad shape," with "facial injuries, severe swelling and bleeding from his facial area." *3 RR 66.*

"[He was] unconscious, nonresponsive," Lt. Pruitt recalled. "And they were preparing to life-flight him out." *3 RR 66.*

6

"[D]o you know about this?" Captain Ballenger asked Spencer, whose house was a short distance away from where Maxwell was lying near some garbage dumptsters outside the Poco Playa Restaurant. *3 RR 28, 67, 175.*

Spencer, who was not in custody at the time, admitted that he had fought with Maxwell and had thrown him off his property. *3 RR 28.*

In addition, DNA testing confirmed to a reasonable degree of scientific certainty that Maxwell's blood was on Spencer's clothing. *3 RR 153-59; SX 28, 29.*

When Lt. Pruitt went to speak with Maxwell at the hospital, he learned that Maxwell "was stable but had severe head trauma and facial fractures." *3 RR 87.*

"Did you ever see the victim regain consciousness?" the prosecutor asked. *3 RR 100.*

"No, ma'am," said the lieutenant, "I never did." *3 RR 100.*

Bobby Nelson, the floor manager at Poco Playa Restaurant, had been driving by his place of business when he saw a body lying on the ground. *3 RR 172, 176-77.*

"I caught a glimpse of just a blood bath," he described the scene. "The man was very bloodied." *3 RR 177.*

7

Later, when Nelson reviewed the restaurant's surveillance video footage, he realized that part of the bloody beating had been caught on camera. *3 RR 179-85; SX 1.*

Revered Richard Lewis and his wife had also seen Maxwell lying in a heap when they drove by the restaurant that same day. *3 RR 201-05.*

"There's a body in the road," Ms. Lewis told her husband. *3 RR 205.*

"I couldn't believe that would be the case," the reverend recalled, "but as it turned out, that's what it was." *3 RR 205.*

"He was totally out," Ms. Lewis said. "I never did see him move that day at all." *4 RR 40.*

"When you saw him at that time," the prosecutor asked, "did he appear bloody or anything like that?" *4 RR 40.*

"No," she said. "I didn't see a mark on him." *4 RR 40.*

"He was just out cold, though?" *4 RR 40.*

"Right." *4 RR 40.*

"I thought he was inebriated," said Reverend Lewis. "I wasn't overly concerned too much because stuff like that happens, and there was people tending to him." *3 RR 207.*

"[W]e figured, well, the guy has help," Ms. Lewis added, "and, so, they're probably going to call an ambulance, and, so, we just started to leave." *4 RR 41.*

8

Still, things "didn't look right" to the reverend. *3 RR 208.*

"I smelled a rat," he said. "I didn't feel at ease with the situation we had left on the side of the road." *3 RR 210.*

His level of unease elevated when he saw in his rearview mirror that the two men who had been tending to the injured man had "left him to his own demise, no one around him, no one taking care of him." *3 RR 210.*

"[W]e were kind of surprised that they just left the body there," said Ms. Lewis. *4 RR 41.*

"I just felt like there was something wrong," Reverend Lewis said, "and that it deserved us taking another look." *3 RR 211.*

So they turned back. *3 RR 211-13.*

Upon returning, the Lewises saw James Spencer beating the inert body of a man who they later learned was Jared Maxwell. *3 RR 213; 4 RR 41.*

"I saw James on top of the body that was laying there," said Reverend Lewis, "and he was pummeling him fast and furious." *3 RR 213.*

"And at that point, what were you seeing?" the prosecutor asked. *3 RR 215.*

"A body that was in a fetal position, unrecognizable," the reverend said. "[I] wouldn't have known who it was if I had known them—bleeding

from the ears, nose, eyes, head. The face was—I've never seen anybody that beaten." *3 RR 215*.

"And was he conscious at all?" *3 RR 215*.

"Oh, no. No. ... He was just barely breathing." *3 RR 215*.

"Since that time, have you had anything to do with Mr. Maxwell?" *3 RR 218*.

"He came to our church one day to thank us ... he said for saving his life." *3 RR 218*.

Dr. Brijesh Gill, who treated Maxwell at the hospital, confirmed the severity of the injuries. *4 RR 47, 53-54, 70-71*.

"[H]e had a number of lacerations on his head," the doctor related. "He had swelling and discoloration, bruising round both eyes. Both of the eyes were swollen almost shut. He also had bleeding within one of his eyes." *4 RR 53-54*.

"What can be the cause of that?" the prosecutor asked. *4 RR 54*.

"Overwhlemingly the cause is traumatic injury," Dr. Gill informed him. *4 RR 54*.

"And were there any fractures of his face or head that you determined?" *4 RR 54*.

"Yes. By CAT Scan of his head and face, there [were] multiple fractures, particularly around the left eye, including the wall of the eye ... on

10

the outside of the face, and as well as multiple fractures of the bones underneath the left eye. And the nose is also broken." *4 RR 54.*

The jury agreed that these injuries were serious and that Spencer had inflicted them: they found him guilty of aggravated assault with a deadly weapon (his fists), and recommended punishment of six years in prison plus a ten-thousand-dollar fine. *6 RR 39-43; 7 RR 127-29; CR 104-06.*

## SUMMARY OF THE ARGUMENT

To be entitled to a self-defense instruction, "there must be some evidence to show that appellant reasonably believed that use of deadly force was immediately necessary to protect himself against [the] use or attempted use of unlawful force." *Dyson v. State*, 672 S.W.2d 460, 463 (Tex. Crim. App. 1984).

Spencer claims that, after he had beaten Maxwell into submission, and after others had carried Maxwell off Spencer's property, Spencer feared for his life when Maxwell was finally able to stand up, because Maxwell had said earlier that he needed to get his keys so he could get a weapon to kill Spencer. *Appellant's Br. at 3.* But "[t]he use of force against another is not justified ... in response to verbal provocation alone." TEX. PENAL CODE § 9.31(b)(1) (West 2011).

Furthermore, the use of force against another is not justified unless the actor "reasonably" believes that "the force is immediately necessary to

11

protect the actor against the other's use or attempted use of unlawful force." TEX. PENAL CODE § 9.31(a). Spencer's professed belief that Maxwell's merely standing up posed an immediate threat of unlawful force is not reasonable, because Maxwell, who was not in Spencer's immediate presence at that time, made no concurrent verbal threat or threatening physical move toward Spencer—nor was there any evidence of circumstances that would prevent Spencer from retreating before Maxwell could find his keys, get a weapon, and return to inflict the damage that Spencer claims to have feared. Therefore, there is no evidence "that would support a belief that retreat was not a reasonable option." *Hamel v. State*, 916 S.W.2d 491, 494 (Tex. Crim. App. 1996).

Maxwell's alleged earlier threat to kill Spencer is also missing the element of immediacy because, at the time Maxwell supposedly said this, he made no physical move to follow through on this claimed threat. *Appellant's Br. at 3-4.*

By the time that Maxell finally recovered enough to stand up, the first fight, at Spencer's house, was already over, as Spencer himself admitted. *Appellant's Br. at 4.* Therefore, his splicing together these two separate events, neither of which by themselves support the submission of an instruction on self-defense, does not justify his request.

12

The evidence here does not show that the victim "took any physical actions against appellant that would have warranted [him] in believing that deadly force was immediately necessary to protect [himself]." *Lane v. State*, 957 S.W.2d 584, 586 (Tex. App.—Dallas 1997, pet. ref'd) (citing *Hamel v. State*, 916 S.W.2d 491, 494 (Tex. Crim. App. 1996)).

Because the evidence here shows, at most, "nothing more than verbal threats made to appellant," it "did not raise the issue of self-defense." *Lane*, 957 S.W.2d at 586. Accordingly, "the trial judge did not err in refusing appellant's requested charge." *Id.*

## ARGUMENT

A defendant is not entitled to an instruction on self-defense unless it is "raised by the evidence." *Dyson v. State*, 672 S.W.2d 460, 463 (Tex. Crim. App. 1984). Here, even viewing the evidence in the light most favorable to Spencer, the evidence does not raise that issue. *Id.* ("If such testimony or other evidence viewed in a favorable light does not establish a case of self-defense, an instruction is not required.").

To be entitled to a self-defense instruction, "there must be some evidence to show that appellant reasonably believed that use of deadly force was immediately necessary to protect himself against [the] use or attempted use of unlawful force." *Dyson*, 672 S.W.2d at 463; *see also Hamel v. State*, 916 S.W.2d 491, 493 (Tex. Crim. App. 1996). In addition,

13

there must be evidence "that a reasonable person in appellant's situation would not have retreated." *Id.*

Spencer claims that, after he had beaten Maxwell into submission, and after others had carried Maxwell off Spencer's property, Maxwell shouted that he needed his keys so that he could come back and kill Spencer. *Appellant's Br. at 3.* But "[t]he use of force against another is not justified ... in response to verbal provocation alone." TEX. PENAL CODE § 9.31(b)(1) (West 2011).

According to Spencer, there was more than mere verbal provocation because, after others had dragged Maxwell across the street, he later managed to stand up, which Spencer interpreted as a sign that Maxwell intended to try to locate a weapon to kill Maxwell. *Appellant's Br. at 3-4.* But the use of force against another is constrained by the requirement that the actor must "reasonably" believe that "the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." TEX. PENAL CODE § 9.31(a). Spencer's professed belief that Maxwell's standing up posed an immediate threat of unlawful force is not reasonable. *Appellant's Br. at 3.*

Standing up does not create any threat, much less an immediate one, particularly when Maxwell was not in Spencer's immediate presence at that time and made no concurrent verbal threat or threatening physical move

14

toward Spencer—nor was there any evidence of circumstances that would prevent Spencer from retreating before Maxwell could find his keys, get a weapon, and return to inflict the damage that Spencer claims to have feared. Therefore, unlike *Hamel*, there is no evidence "that would support a belief that retreat was not a reasonable option." 916 S.W.2d at 494. Spencer says he went to his car to get his phone to call the police. *Appellant's Br. at 3.* If so, he could have gotten in his car and driven to the police if, as he claims (but the evidence does not support) they could not have arrived within thirty minutes.

In *Hamel*, unlike here, the victim's alleged verbal threat "did not stand alone." 916 S.W.2d at 494. His move "toward the car was the physical act that rendered his conduct more than a mere threat" because the appellant had been told that there was a knife in the car, which was within the victim's immediate reach. *Id.* Here, there was no such move toward the victim's car, which Spencer speculates would furnish the transportation to find a weapon. The car was not "within the victim's immediate reach," nor was there a weapon in the car, whose keys he did not even have on his person. *Appellant's Br. at 3.*

The victim in *Hamel* "was far closer to his car than appellant was to the back door of the house, and appellant did not think he could take a chance on being caught in the back yard with only a pocket knife if [the

15

victim] had a gun." 916 S.W.2d at 494. In contrast, there is no evidence that Maxwell was so close to a weapon that he could use it before Spencer could flee. *Appellant's Br. at 3.* According to Spencer's own account, Maxwell would first have to find his keys, leave, get the weapon, then return to Spencer's house. *Appellant's Br. at 3-4.* Therefore, the absent weapon that Spencer professedly feared was nowhere near Maxwell nor Spencer at the time.

Spencer's claim that he felt he needed to use further physical force on Maxwell to keep him down until the police arrived is also unreasonable. According to Spencer, he could not wait for the police because it would take them thirty minutes or more to respond to an emergency call. *Appellant's Br.* But there is no evidence in the record to support that time estimate. There is also no evidence of how long it would take Spencer to locate a weapon, assuming he could ever locate his keys. Nor is there any evidence that if, as Spencer claims, the police could not make it to his house in thirty minutes, he could not have retreated to the police station—or anywhere else—before Maxwell left and returned to Spencer's house. As a result, Spencer's professed fears of a phantom attack rest solely on his own self-serving speculation, not on any actual facts.

Even indulging in the dubious fiction that Maxell's purpose in standing up was to attack Spencer, any such alleged act was not immediate

16

because Maxwell's standing up was unaccompanied by any concurrent verbal or physical threat. *Appellant's Br. at 3.* According to Spencer's own version of events, Maxwell, who was across the street at the time, did not approach Spencer—just the opposite: Spencer confronted Maxwell and re-beat him up. *Appellant's Br. at 3-4.*

The element of immediacy is also missing from Maxwell's earlier alleged threat to kill Spencer, because, at the time of this purported utterance, Maxwell made no physical move to follow through on this claimed threat. *Appellant's Br. at 3-4.* The State did not, as Spencer asserts, "concede" that this alleged verbal threat "[gave] rise to self-defense by [appellant]." *Appellant's Br. at 7-8* (citing *5 RR 8*). The prosecutor argued only that extraneous evidence of other alleged violence by the victim was not admissible because the alleged act here was unambiguous, not that it was sufficient to support a self-defense instruction. *5 RR 7-8.*

By the time that Maxell finally recovered enough to stand up across the street, the first fight, at Spencer's house, was, by Spencer's own admission already over. *Appellant's Br. at 4* ("Appellant agreed that the fight was over."). According to Spencer himself, the two beatings were separate in time and purpose. Therefore, he cannot bridge the factual gap in his self-defense theory by splicing together two separate events, neither of which by themselves support the submission of an instruction on self-

17

defense. *See Lane v. State*, 957 S.W.2d 584, 586 (Tex. App.—Dallas 1997, pet. ref'd) (rejecting the defendant's reliance "only on the verbal threats" the victim allegedly made several hours before the defendant shot him, because "verbal threats alone do not justify the use of force against another").

Here, as in *Lane*, "[t]here is no evidence that [the victim] took any physical actions against appellant that would have warranted [him] in believing that deadly force was immediately necessary to protect [himself]." 957 S.W.2d at 586 (citing *Hamel v. State*, 916 S.W.2d 491, 494 (Tex. Crim. App. 1996)). Therefore, the evidence here shows, at most, "nothing more than verbal threats made to appellant ... the evidence did not raise the issue of self-defense." *Lane*, 957 S.W.2d at 586.

Like the appellant in *Lane*, Spencer "cites *Hamel* for the proposition that self-defense can be used to protect oneself from apparent danger as well as from real danger." 957 S.W.2d at 586. But "the facts of *Hamel* also show that, in addition to verbal threats, the deceased made a physical act (i.e., walking towards a car where the deceased said he had a gun) before the defendant stabbed the deceased." *Id.* Therefore, *Hamel* "stands for the proposition that the use of force is not justified in response to verbal provocation alone." *Id.* (citing *Hamel*, 916 S.W.2d at 494); *see also Halbert v. State*, 881 S.W.2d 121, 124 (Tex. App.—Houston [1st Dist.] 1994, pet.

18

ref'd) (in which the evidence supporting the submission of a self-defense instruction included not only verbal threats, but also the deceased's having physically advanced toward the defendant).

Here, not only was there no physical threat or circumstance accompanying a verbal threat, there was not even a verbal threat at the time of the second beating. Therefore, the trial court correctly refused Spencer's request for an instruction on self-defense. *Hamel*, 957 S.W.2d at 586.

## PRAYER

For these reasons, the State asks this court to:

- affirm the judgment and sentence in all respects;

- deny all relief that Appellant has requested; and

- grant the State all other relief to which it is entitled.

Respectfully submitted,

STEVEN E. REIS
State Bar No. 16757960
sreis@matagorda.tx.us
LINDSAY K. DESHOTELS
State Bar No. 24069608
Matagorda County Courthouse
1700 7th Street, Suite 325
Bay City, Texas  77414
Telephone:  (979) 244-7657
Telecopier:  (979) 245-9409

/s/ Robinson C. Ramsey
ROBINSON C. RAMSEY
State Bar No. 16523700
rramsey@langleybanack.com
Trinity Plaza II, Suite 900
745 E. Mulberry Avenue
San Antonio, Texas 78212
Telephone:  (210) 736-6600
Telecopier:  (210) 735-6889

ATTORNEYS FOR THE STATE
OF TEXAS

## CERTIFICATION OF COMPLIANCE

The State certifies that the number of words in the State's Brief, including its headings, footnotes, and quotations, is: **3233.**

/s/ Robinson C. Ramsey
ROBINSON C. RAMSEY

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing document was served on counsel for Appellant:

Robert Swofford
State Bar No. 00791765
SWOFFORD LAW FIRM, PLLC
5225 Katy Freeway, Suite 605
Houston, Texas  77007
Telephone: 281.772.8976
Telecopier: 713.782.5226
Email: rob@swoffordlaw.com

Joe Gonyea
State Bar No. 24062749
GONYEA, PLLC
2118 Smith Street
Houston, Texas  77002
Telephone: 713.554.4564
Telecopier: 713.554.4567
Email: jgonyea@gonyea-law.com

on December 22, 2015.

/s/ Robinson C. Ramsey
ROBINSON C. RAMSEY

20